UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CRIMINAL NO.: 1:08cr00214-RMC |
| v. | ) | |
| | ) | |
| NEMR ALI ZHAYTER, | ) | |
| A/K/A SHADI, | ) | |
| | ) | |
| Defendant. | ) | |

**GOVERNMENT'S NOTICE TO THE DEFENDANT
AND MOTION TO ADMIT EVIDENCE OF OTHER CRIMES
PURSUANT TO RULE 404(b) OF THE FEDERAL RULES OF EVIDENCE**

The United States of America, by and through its undersigned counsel, notifies this Court

and the defendant of its intent to admit evidence at trial pertaining to certain recorded

conversations and statements made by the defendant and others, foreign drug seizures, foreign-

executed arrest and search warrants, and other conduct related to drug trafficking that was

committed by the defendant and his conspirators.

Rule 404(b) of the Federal Rules of Evidence states that the government shall provide

reasonable notice of the general nature of any "other crimes" evidence the government intends to

introduce at trial.  The government submits that many of the acts set out in this Notice are

intrinsic to and direct evidence of the crime charged, that is "inexplicably intertwined" with the

charged offense, and are thus not subject to the limitations in Rule 404(b).  *United States v.

Moore*, – F.3d – , 2011 WL 3211511, at *24 (D.C. Cir. 2011); *United States v. Bowie*, 232 F.3d

923, 927-28 (D.C. Cir. 2000); *United States v. Badru*, 97 F.3d 1471, 1475 (D.C. Cir. 1996), *cert.

denied*, 520 U.S. 1150 (1997).  However, in the event this Court concludes that some or all of the

acts described in this Notice are subject to a Rule 404(b) analysis, the government hereby puts

the defendant on notice of its intent to seek admission of these acts and evidence at trial pursuant to Rule 404(b).

## FACTUAL BACKGROUND

YAHYA ALI ZAITAR, a/k/a "Yehya Ali Daoud Zeiter," a/k/a "Abu Rabih" (hereafter "ZAITAR") has been separately charged in this district on cocaine and heroin related offenses. The heroin importation conspiracy case is the subject of Criminal Case No. 1:08cr123 and the case is set for trial May 14, 2012. Specifically, on April 25, 2008, ZAITAR was indicted by a federal grand jury sitting in the District of Columbia and charged with conspiring, from in or about May 2007 to April 25, 2008, in Paraguay, Brazil, Romania, and elsewhere, to (1) knowingly and intentionally import 1 kilogram or more of heroin into the United States from the Middle East, in violation of 21 U.S.C. §§ 952 and 960, and (2) knowingly and intentionally distribute 1 kilogram or more of heroin, intending and knowing that such substance would be unlawfully imported into the United States, in violation of 21 U.S.C. §§ 959(a) and 960, all in violation of 21 U.S.C. §§ 960 and 963, and 18 U.S.C. § 2. ZAITAR's conspirators include, among others, his brother NEMR ALI ZHAYTER, a/k/a "Shadi," who was separately indicted in this district in the same heroin importation conspiracy on July 17, 2008 (Criminal Case No. 1:08cr214); ZAITAR's and ZHAYTER's cases are currently joined for trial. ZAITAR and ZHAYTER are collectively referred to herein as "the defendants."[1]

ZAITAR was also indicted on November 30, 2007, by a federal grand jury sitting in the District of Columbia on charges of conspiring, from in or about July 2007 through the date of

---

[1] As a result of Criminal Case Nos. 1:08cr123 and 1:08cr214 being joined for trial, this Notice will be filed in both cases, with the difference in content being only the captions.

indictment, in Paraguay, the United States and elsewhere, with MOHAMMED ALI AWALI, a/k/a "Ali Gordo," to (1) knowingly and intentionally import 500 grams or more of cocaine into the United States from Paraguay, in violation of 21 U.S.C. §§ 952 and 960, and (2) knowingly and intentionally distribute 500 grams or more of cocaine intending and knowing that such substance would be unlawfully imported into the United States, in violation of 21 U.S.C. §§ 959(a) and 960, all in violation of 21 U.S.C. §§ 960 and 963 and 18 U.S.C. § 2. ZAITAR and AWALI were also charged in Count Two of that indictment with distribution of 500 grams or more of cocaine knowing and intending it will be imported into the United States, in violation of 21 U.S.C. §§ 959(a) and 960.  That indictment was superseded on April 25, 2008, to encompass a five kilograms or more cocaine importation conspiracy in Count One and to extend the conspiracy out to the date of the superseding indictment; Count Two remained the same.  Count Two relates to an October 6, 2007 transaction where, at ZAITAR's instruction, AWALI transported a kilogram test sample of cocaine to a Burger King restaurant in Ciudad del Este, Paraguay, and delivered the cocaine, which was hidden in a concealed and hidden compartment of a rolling suitcase, to a Paraguayan undercover officer posing as a drug mule.

## GENERAL NATURE OF THE "OTHER CRIMES" EVIDENCE

I.    **Evidence Relating To ZAITAR's And ZHAYTER's Cocaine Trafficking[2]**

    A.    **Audio and video recordings**

The government intends to introduce at trial audio and video recordings, transcriptions / translations of recordings, and witness testimony relating to ZAITAR's and ZHAYTER's

---

[2] Although the government will seek to admit evidence relating to the defendants' cocaine trafficking, the government will be opposing any defense motions that allege the heroin and cocaine importation conspiracies were a single conspiracy.

involvement in cocaine trafficking as evidence inextricably intertwined with the heroin trafficking conspiracy charged.  The recordings are of telephone calls and in-person meetings, and were made by confidential informants or undercover federal agents from in or about May 2007 until ZAITAR's arrest in Romania in April 2008.  The recordings also include calls recorded through a judicialized wiretap conducted by Romanian law enforcement authorities between April 8, 2008 and April 15, 2008, when ZAITAR was in Bucharest, Romania.

The heroin and cocaine cases against ZAITAR arose out of similar circumstances.  In or about July 2007, a DEA confidential informant (hereinafter "CI") posing as a narcotics trafficker introduced an undercover federal agent (hereinafter "UC") to ZAITAR; the CI represented to ZAITAR that the UC was the head of a narcotics trafficking organization based in New York.  At the time, the CI had known ZAITAR for more than ten months and several months earlier had engaged in initial discussions with ZAITAR about heroin and cocaine sales.  Between in or about May 2007 and April 2008, the CI and the UC recorded various calls or meetings (some in video form) with ZAITAR and/or others, including ZHAYTER on at least one occasion, during which the parties discussed plans to engage in heroin and/or cocaine transactions, including transactions for test samples of heroin and cocaine (of one to three kilograms for the heroin and one kilogram for the cocaine) and future transactions for tens of kilograms of each thereafter.

During the first six months of those communications, the conversations focused largely on ZAITAR's plans with AWALI, who also participated in some of those conversations, to sell the UC a test sample of one kilogram of cocaine and then, later, at least 50 kilograms of cocaine.  More specifically, ZAITAR's and/or AWALI's cocaine-related statements pertained to, among other topics:  the quality and quantities of cocaine ZAITAR and AWALI could provide; the

cocaine source, transit, or destination countries ZAITAR and AWALI would utilize (including

that the cocaine would ultimately be sent to the U.S. and drug mules or couriers would utilize

various routes or flights as arranged by ZAITAR and AWALI to transport and deliver the

cocaine); the price of the cocaine in various countries, including the U.S., and the profits that

could be derived from its sale; the method and manner they would use to conceal the cocaine in

luggage, shipping containers, and planes, for transport, as well as their direct involvement in

preparing the cocaine packages; trips AWALI made on ZAITAR's behalf to secure multi-

kilogram quantities of cocaine; the business arrangement ZAITAR and AWALI proposed for

future larger deals with the UC; the identities of their cocaine-trafficking associates, including

individuals ZAITAR trained in the business; ZAITAR's and AWALI's requests to others to

procure drug mules or couriers for them and the payment the mules or couriers would receive for

their smuggling assistance (including ZAITAR's requests to the CI to procure drug mules and/or

to coordinate and purchase the flights for the mules' illicit travels); drug shipments lost by

ZAITAR and AWALI through drug mules' arrests[3]; and drug debts ZAITAR paid to sources of

supply.  However, during some of these conversations, ZAITAR (and AWALI) also discussed his

and his associates' abilities and desire to also engage in heroin trafficking with the UC and CI.

ZAITAR told the informant he had the "merchandise," meaning cocaine and heroin, to send to

the UC and that he wanted to "work" and start a business relationship with someone new.  For

example, ZAITAR proposed sending heroin from Syria to Spain and cocaine from South

---

[3] For instance, on or about August 23, 2007, AWALI told the CI that he and ZAITAR had recently provided a female drug mule with 4.6 kilograms of cocaine to transport to Jordan but she was arrested at the Foz de Iguacu, Brazil airport en route.  AWALI stated he and ZAITAR prepared the bag containing the cocaine.

America to Spain for both to then be delivered to the UC in New York.[4]

As the informant and UC's cocaine and heroin related discussions with ZAITAR ensued, ZAITAR met with the UC and CI in Santiago, Chile on or about October 30, 2007, to continue the narcotics negotiations. As was the case in prior recorded communications with ZAITAR, the conversation recorded during that meeting included statements by ZAITAR of his and his associates' abilities to engage in both heroin and cocaine trafficking with the UC and CI. For instance, ZAITAR stated he could sell 50 to 100 kilograms of cocaine to the undercover agent, which he had access to from Bolivia, and that the cocaine could be transported via private plane from Bolivia to initially Paraguay for subsequent delivery to the undercover agent for importation into the United States. ZAITAR also told the undercover agent he wanted to start a cocaine venture with the undercover agent with each equally sharing all expenses and profits. However, the UC stated he was no longer interested in obtaining cocaine from ZAITAR at that time and wanted to concentrate on obtaining heroin from him. Their conversation then turned to their planned heroin trafficking.

ZAITAR discussed selling 40 kilograms of heroin to the undercover agent. In the course of that discussion, ZAITAR stated his source of supply was his brother in Turkey and described the quality and type of heroin that they would provide to the UC. ZAITAR also described how he would provide that heroin – he stated he could conceal 10 kilograms of heroin in the sides of luggage and would send each courier with two pieces of luggage so that each courier transported

---

[4] AWALI is not charged with ZAITAR or ZHAYTER in the heroin importation conspiracy. While ZHAYTER appears to have been present at certain meetings between ZAITAR and the informant, he did not participate in any recorded communications with the UC about cocaine or heroin trafficking. ZHAYTER is not charged in the cocaine importation conspiracy case with ZAITAR and AWALI.

20 kilograms of heroin.  ZAITAR also discussed heroin transportation routes from Afghanistan or Turkey to New York City and stated that his brother could guarantee safe air passage of the heroin out of Turkey, but that the undercover agent would have to guarantee safe passage of the heroin into New York.  Significantly, ZAITAR proposed that he could send kilograms of cocaine with a courier to his brother overseas in exchange for the heroin.  The two also discussed having the heroin transported first to Chile, with subsequent transport to the United States.  ZAITAR ultimately agreed to provide the undercover agent with a three (3) kilogram sample of heroin, for $40,000 in U.S. currency, which would be sent to New York so that the undercover agent could evaluate the quality of the heroin that ZAITAR and his brother supplied.  The undercover agent told ZAITAR he would be interested in ordering 40 kilograms of heroin thereafter, to start. ZAITAR agreed to call his brother the following day for additional information about the planned heroin transaction.

 After the October 30th meeting, ZAITAR engaged in several more recorded telephone calls or meetings with the informant and the undercover agent during which they discussed the details of the planned heroin deals.  On at least one occasion, ZAITAR discussed his continued interest in and ability to supply the UC with 50 kilograms or more of cocaine, including that he could provide higher discounts to the UC for the cost of the cocaine if the UC purchased it at larger quantities.  On another occasion, ZAITAR told the CI he had 2 kilograms of "merchandise" (cocaine) in Portugal and asked the CI to call the UC to see if he wanted it.   Of further significance to this Notice, several times ZAITAR reminded the UC and/or CI that he previously sent the one kilogram test sample of cocaine to the UC (the October 6, 2007 transaction where AWALI delivered the one kilogram of cocaine to the Paraguayan undercover

officer at ZAITAR's direction) and that subsequent deals with the UC for larger quantities of cocaine never occurred as they had discussed and ZAITAR expected.  ZAITAR expressed concern that the same would result if he now provided only a one to three kilogram test sample of heroin to the UC; ZAITAR noted he was the "owner of this business" and met with the UC in Chile to engage in large scale trafficking, not the distribution of small samples of drugs. Consequently, for the future heroin transactions, ZAITAR at times either refused to provide *only* one kilogram of heroin, as he had in the cocaine transaction, when he had the capacity to distribute heroin in much larger quantities to the UC, or ZAITAR demanded that the UC pay him the money for the heroin up front to avoid losing money as he felt he had on the prior cocaine deal.  In communications with the undercover agent, ZAITAR also stated that in Paraguay, he (and in Lebanon, his brother) had access to *both* heroin and cocaine (described in code as "shirts" and "pants" in the conversation), in whatever quantities the UC wanted, in an attempt to entice the UC into larger heroin transactions.

The first week of April 2008, ZAITAR traveled with the CI to Romania to meet with the UC to finalize the heroin negotiations and to provide a test sample.  While there, in-person and telephonic conversations with ZAITAR were recorded by informants and undercover agents.  In addition, between April 8, 2008 and April 14, 2008, ZAITAR made numerous telephone calls to his narcotics associates overseas in Lebanon, South America or elsewhere.  These calls were intercepted pursuant to a lawful judicialized wiretap conducted by Romanian law enforcement authorities pursuant to a United States Mutual Legal Assistance Treaty request.  The purpose of many of the wiretapped calls was for ZAITAR to coordinate the transport of the test sample of heroin from his associates for delivery by a courier to ZAITAR and the undercover agent in

Bucharest.  In addition, during some of these calls, ZAITAR also discussed with some of his associates the future transactions of up to 50 kilograms of heroin to be expected for the organization if the undercover agent was pleased with the test sample's quality.

Of significant to this trial-related Notice in terms of how the heroin conspiracy / organization operated, during the calls ZAITAR directed ZHAYTER to:  (1) procure the drug mules or couriers to transport and deliver the heroin sample from Lebanon to Romania and to personally arrange for or to supervise other organizational members in planning the mule's or courier's itinerary, obtaining the requisite passports, visas and airline tickets, and paying the travel costs and smuggling fees to the mules or couriers; (2) consult telephonically and in-person with other organizational members and at least one source of supply, in order to obtain information on the price and availability of a kilogram of heroin, the supplier's ability to fulfill the test sample order during the week ZAITAR and the undercover agent were in Romania, and the transport of the heroin from the supplier in Lebanon; and (3) coordinate with at least two organizational members to ensure they tested the quality of the sample and re-packaged the heroin into a suitcase for ultimate delivery to ZAITAR by a courier once the heroin sample was received from the Lebanon source of supply.  In some of the calls, ZHAYTER lamented that he had to halt his own drug trafficking operations to provide money and mules for ZAITAR's heroin transaction, that he needed the borrowed mules returned to him, and that he himself was waiting for money to be paid to him for drugs earlier distributed.  ZAITAR and ZHAYTER also discussed using money ZHAYTER would obtain from his participation in the heroin deal to repossess property then held by another conspirator, Zouhair ZEAYTER.

While in Bucharest, ZAITAR also engaged in a series of wiretapped calls with his

associates about the money the UC was paying for the heroin, including, but not limited to, calls

with ZHAYTER and their relative Samir Sobhi ZEAITER, who worked at a bank.  Samir

ZEAITER provided specific guidance to ZAITAR on how best to transfer large sums of money

coming from the United States to avoid detection by banking anti-money laundering authorities.

Cocaine-related conversations with the CI also continued in Romania.  For instance,

ZAITAR told the CI that he had approximately 150 kilograms of cocaine sitting in a container in

Germany that he could not pass through customs.  ZAITAR stated that if the UC had the

connections in Spain as he asserted, ZAITAR could deliver the container with the cocaine to the

UC in Spain; ZAITAR stated the container was from his brother.  ZAITAR discussed this

container with Ramzi ZEAYTER and Zouhair ZEAYTER over wiretapped calls. ZAITAR also

told the CI a story about 31 kilograms, believed to be of cocaine, that he sent with a Paraguayan

mule to Spain and when the female mule arrived in Spain, she made a call in the taxi asking what

to do with the merchandise; the driver called the police and the mule's arrest was on the news.

ZAITAR told the CI that he who sells cocaine also sells heroin because it involves the same

customers and he (ZAITAR) cannot turn his back on the heroin deal with the UC.

In other recorded calls or meetings, including wiretapped calls, individuals were

identified by nicknames, their relationships (*e.g.,* familial) explained, and telephone numbers of

associates exchanged to facilitate the conspiracy.

**B.** **Videos, photographs, forensic analyses, documentation and witness testimony relating to the October 6, 2007 controlled buy**

As part of and to further the negotiations to distribute large quantities of cocaine

for importation into and subsequent distribution in the United States, ZAITAR and AWALI

agreed to sell a test sample of one kilogram of cocaine to the informant and the undercover agent

so that the two could evaluate the quality of the cocaine that ZAITAR and AWALI supplied.

ZAITAR and AWALI further agreed that if the informant and the undercover agent liked the

quality of the cocaine, ZAITAR and AWALI would sell them cocaine in quantities of 50

kilograms or more for importation into New York.  On or about October 6, 2007, at ZAITAR's

instruction, AWALI transported a kilogram of cocaine in his vehicle to a Burger King restaurant

in Ciudad del Este, Paraguay, where he delivered the cocaine, which was hidden in a concealed

and hidden compartment of a rolling suitcase, to an individual whom he believed was the

informant's courier.  The individual was a Paraguayan undercover officer posing as a drug mule.

AWALI met with the informant and received approximately $6,500 in United States currency as

payment for the one kilogram test sample; directly after the transaction, ZAITAR and AWALI

spoke by telephone and AWALI informed ZAITAR he had the money and was on his way to

meet with ZAITAR. After the undercover officer turned the suitcase over to authorities, a search

was conducted and the substance was found secreted in a double-bottomed area in the inside

back portion of the suitcase; the substance tested positive for cocaine both during a field-test and

later by a chemist.  The cocaine was packaged in two separate plastic-wrapped packages of

approximately 500 grams each, for a combined weight of approximately one kilogram.  This

controlled buy with AWALI, and the subsequent search of the seized suitcase, was photographed

and/or videotaped; forensic analyses were conducted of the cocaine and suitcase; and related

reports were prepared by Paraguayan law enforcement authorities documenting the controlled

buy event and search.

II.   **Evidence Seized In Paraguay On Or About August 6, 2008, During The Arrests Of And Search Warrants Associated With ZHAYTER And Other Conspirators**

On or about August 6, 2008, ZHAYTER and several other individuals, including Amer Zoher EL HOSSNI and Samir Sobhi ZEAITER, who are believed to have engaged in drug-related wiretapped calls with ZAITAR in April 2008, were arrested in Paraguay and their persons and properties searched.  ZHAYTER and EL HOSSNI were arrested pursuant to provisional arrest warrants submitted by the United States.  The results of those arrests and searches were explained in detail by the Paraguayan authorities in materials provided to the U.S. government through two Vienna Convention Mutual Legal Assistance Treaty requests.  Videos, photographs, forensic analyses, documentation/reports, and witness and defendant statements received in the MLAT that related to the August 6, 2008 arrests and search warrants have been provided to the defense.

Physical evidence seized during the Paraguayan takedown included, but was not limited to, numerous cellular telephones and SIM cards / chips; a CPU; U.S. currency; documents (debit cards, vehicle records, identification documents, travel documents / passports, financial documents and receipts, shipping documents, luggage tickets, loose pages containing numbers); daily planners or agendas; and ammunition.  Drug paraphernalia indicative of personal use and distribution of drugs was also seized, to include:  marijuana, cocaine, K-Orthrine, terbinafine hydrochyloride, Stamyl pills, Atamel Plus pills, Lactopurga pills, cigarette papers, metal press, steel press and its molds (to make capsules, positive for cocaine residue), packets of balloons, ice bags, Lemotools brand hydraulic jack, red wax, drum containing a viscous liquid inside, bicycle pumps, arguile pipe, rolls of paper film, silicone gun for silicone, tubes of glue, gray racing tapes,

precision digital scale, cylinder bars, cutters, scissors, tweezers, tubes with paper film, black isolation tape, wire, small piece of wood, fork, and small funnels (positive for cocaine residue). Thereafter, forensic analyses were conducted on some of the evidence, to include the drugs, manufacturing/packaging tools and equipment, and the electronic media seized.

## III.   ZAITAR's and ZHAYTER's post-arrest statements

Following his arrest in Bucharest on or about April 14, 2008, ZAITAR was interviewed by DEA agents.  During that interview, among other statements, ZAITAR identified family members and other associates, admitted he was a cocaine trafficker, acknowledged that he was in Romania for the same business that he had traveled to Chile to discuss, confirmed his family and ZHAYTER kept numerous suitcases in their residence, and said that there was no mule for a heroin transport.  He was also recorded by an informant following his arrest.  In that recording, he admitted to possessing flight information for a trip to Jordan (for a drug mule), asked the informant to lie about their reasons for being in Romania, stated he was in the process of erasing his telephone on the ride to the police station, and expressed concern for providing the authorities his Brazilian documentation because "something" would come up there on him.

## LEGAL ANALYSIS

## I.   The Foregoing Evidence Is Not "Other Crimes" Evidence But Is Instead Admissible As Direct Evidence Of The Charged Conspiracy.

### A.   Relevant case law

Rule 404(b) of the Federal Rules of Evidence provides:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith.  It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident,

provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial.

Fed. R. Evid. 404(b) (2011).  Explained differently, Rule 404(b) "excludes only evidence 'extrinsic' or 'extraneous' to the crimes charged, not evidence that is 'intrinsic' or 'inextricably intertwined.'" *United States v. Allen*, 960 F.2d 1055, 1058 (D.C. Cir.), *cert. denied*, 506 U.S. 881 (1992); *see also United States v. Gartmon*, 146 F.3d 1015, 1020 (D.C. Cir. 1998) (evidence that defendant charged with fraud had threatened a co-conspirator not "other crimes evidence" but instead "inextricably intertwined" with charged offense).

The Court of Appeals adopted defining intrinsic "other crimes" evidence this way:

Evidence of criminal activity other than the charged offense is not considered extrinsic if it is an uncharged offense which arose out of the same transaction or series of transactions as the charged offense, if it was inextricably intertwined with the evidence regarding the charged offense, or it is necessary to complete the story of the crime of trial . . .

*United States v. Badru*, 97 F.3d 1471, 1474 (D.C. Cir. 1996), *cert. denied*, 520 U.S. 1150 (1997) (citing *United States v. Weeks*, 716 F.2d 830, 832 (11th Cir. 1983)).  In *Badru*, defendants were charged with conspiracy to distribute and possess with the intent to distribute heroin and actual counts of distribution.  *Id*. at 1473.  At trial, the government introduced evidence that the defendants had previously been involved in smuggling heroin into the United States through the use of couriers.  *Id* at 1473-74.  The Court of Appeals held that the evidence was not "other crimes" within the purview of Federal Rule of Evidence 404(b); instead, it had been properly admitted as "intrinsic" other crimes evidence:

Given the similar modus operandi between the couriers' previous trips to Nigeria and the planning and execution of the trip that ended in April 1993 with the

14

seizure of 5,569 grams of heroin from the couriers' luggage, a jury reasonably could find that appellants conducted the previous trips for the same purpose as the trip that ended in April 1993.

*Id*. at 1475.

The above-referenced evidence, which may be presented by the government at trial, is admissible as direct evidence of the charged drug conspiracy and is not subject to the strictures of Federal Rule of Evidence 404(b).  The proposed evidence and testimony involves acts of (and statements associated with) the negotiation, purchase, sale and transportation of cocaine, and other conduct which is inextricably intertwined with the charged heroin conspiracy.  In a conspiracy case, "evidence directly relevant to the charged offenses" are admissible as direct or intrinsic evidence of a crime charged.  *Badru*, 97 F.3d at 1475.

Evidence intrinsic to the charged crime includes background evidence and evidence necessary to complete the story of the charged conspiracy.  *United States v. Garces*, 133 F.3d 70, 77 (D.C. Cir. 1998) (holding that evidence referencing an arrest warrant and its execution "was part of the story" of explaining the seizure of a car and its contraband and thus was not "other crimes evidence").  Background evidence also includes evidence that explains the relationship of the parties or the circumstances surrounding an event.  As the Court of Appeals stated in *United States v. Mathis*, 216 F.3d 18 (D.C. Cir.), *cert. denied*, 531 U.S. 972 (2000), "[i]n a conspiracy prosecution, the government is usually allowed considerable leeway in offering evidence of other offenses 'to inform the jury of the background of the conspiracy charged, to complete the story of the crimes charged, and to help explain to the jury how the illegal relationship between the participants in the crime developed.'" *Mathis*, 216 F.3d at 26 (*quoting United States v. Williams*, 205 F.3d 23, 33-34 (2d Cir. 2000)).  In *Mathis*, the district court admitted evidence of the

15

defendant's involvement in a separate uncharged drug conspiracy to show his intent to act in concert with his brother in the charged drug conspiracy. *See also United States v. Morrow*, Crim. No. 04-355, Slip op., 2005 WL 3159572, *6 (D.D.C. April 7, 2005) (Kollar- Kotelly, J.) (citing cases from other circuits). Evidence of conduct which facilitated the charged conspiracy also takes such acts outside the scope of Rule 404(b). *United States v. Bowie*, 232 F.3d 923, 929 (D.C. Cir. 2000) ("[U]ncharged acts performed contemporaneously with the charged crime may be termed intrinsic if they facilitate the commission of the charged crime."). "Evidence that is offered as being 'directly relevant to the charged offenses' is not 'other crimes' evidence within the meaning of Rule 404(b). *See United States v. Badru,* 97 F.3d 1471, 1474-75 (D.C. Cir.1996). As such, '[w]hen the indictment contains a [] conspiracy charge, uncharged acts may be admissible as direct evidence of the conspiracy itself,' and are thus not Rule 404(b) evidence." *United States v. Cooper*, 91 F.Supp.2d 79, 82 (D.D.C. 2000) (quoting *United States v. Thai*, 29 F.3d 785, 812 (2d Cir.1994)).

Conduct relating to the financing of drug transactions and the movement of money which was designed to further the goals of the organization and the conspiracy during the period of the indictment are additionally part and parcel to the crime charged. Such steps would facilitate the commission of the charged crimes; acts conducted in furtherance of the drug conspiracy are vital to its survival. A drug conspiracy without drugs or the ability to deliver drugs is not a criminal conspiracy. Thus, as direct evidence of the charged conspiracy, it is admissible at trial without the Court conducting a 404(b) analysis.

Similarly, the procurement of drugs, along with the means to transport it, such as in container ships, via planes, or through the use of mules and couriers, as well as the method of

concealment of the cocaine (in luggage or other items), is intrinsic to the scheme to import and distribute drugs and does not constitute other crimes evidence. *United States v. Badru*, 97 F.3d 1471 (D.C. Cir. 1996), *cert. denied*, 520 U.S. 1150 (1997) (evidence of procurement of heroin from Nigeria was intrinsic to proof of scheme to distribute). Along those lines, the evidence of other, even prior, drug transactions are also relevant and admissible as evidence of a defendant's and his associates' intent to engage in future drug transactions, knowledge of the drug trade, or a common scheme or plan. *United States v. Latney*, 108 F.3d 1446, 1448 (D.C. Cir.), (404(b) analysis also applies to evidence of a later drug transaction and is relevant as evidence of the defendant's intent and knowledge), *cert. denied*, 522 U.S. 940 (1997); *United States v. Crowder*, 141 F.3d 1202 (D.C. Cir. 1998) (affirming introduction of a subsequent drug crime several months after the charged offense as relevant to a possession of crack cocaine with intent to distribute charge when the defendant was arrested months later selling crack on the same block; evidence went to the defendant's intent to distribute and knowledge that the substance was crack cocaine, a controlled substance)*, cert. denied*, 525 U.S. 1149 (1999). Particularly relevant for the instant matter, the courts have held that prior drug dealing can even be relevant where the prior transaction involved a different drug. *United States v. Devine*, 934 F.2d 1325, 1345-46 (5th Cir. 1991) (holding that defendant's prior involvement in cocaine distribution was relevant to current charge of conspiracy to manufacture and sell methamphetamine); *United States v. Broussard*, 80 F.3d 1025, 1040 (5th Cir. 1996) (ten year old prior transaction involving different drug admissible in light of fact that both offenses involved conspiracies to possess drugs with intent to distribute).

**B.**     **Bases for admitting the proposed evidence and testimony as direct evidence.**

For the reasons just outlined, the above-proposed evidence and testimony should be admitted as direct evidence, intrinsic to the charged heroin importation conspiracy.

The various cocaine-related audio and video recordings in this case, which are numerous and only some of which are referenced above, and the witness testimony and transcriptions / translations pertaining to said recordings, are intrinsic to the crimes charged, that is "inexplicably intertwined" with the charged offense and thus are not subject to the limitations in Rule 404(b).

First, the communications are relevant as background evidence to complete the story of the initiation of the conspiracy, and to explain the relationship of the parties and the conspirators. The communications explain when, how and why the UC was introduced to ZAITAR by the CI and how their negotiations progressed from a cocaine deal to a heroin deal, with ZAITAR ultimately traveling to Romania to deliver the heroin test sample and finalize the larger multi-kilogram heroin transaction. The recordings also explain how and why ZAITAR negotiated the heroin transactions as he did with the UC, given his experience in (and the undesirable outcome of, at least in ZAITAR's mind) negotiating the prior cocaine transactions.

Second, the cocaine-related conversations also show ZAITAR intentionally and knowingly participated in the charged offense. Evidence that ZAITAR previously participated in a conspiracy to distribute export quantities of cocaine for importation into the United States is highly relevant to demonstrate with regard to the charged offense that he knowingly and intentionally joined, albeit with other conspirators than in the cocaine case, a heroin related importation conspiracy. The progression of the negotiations from cocaine trafficking to heroin trafficking also demonstrate ZAITAR's motive in recruiting other individuals (such as his

brother ZHAYTER, additional brothers and relatives in Lebanon, and others), in order to continue his drug business relationship with the UC, which had stalled on the cocaine front, to ensure the continued financial success of ZAITAR's trafficking enterprise.  The recordings also aid in understanding how the ZAITAR drug trafficking enterprise was structured, with ZAITAR as the leader, responsible for directing his associates, including ZHAYTER, to engage in acts in furtherance of the heroin conspiracy (much like AWALI in the cocaine conspiracy case).

Third, the cocaine-related recordings, transcripts, and testimony are significant to the charged offense in that they show ZAITAR knowingly sought to further the object of the heroin conspiracy.  For example, ZAITAR's recorded admissions that he previously supplied a kilogram quantity of cocaine to the UC in order for the UC to test the product in the New York market (he knew the UC was American), with plans to supply much larger quantities thereafter, makes it more probable that he also intended to distribute heroin to the UC, that he intended and knew the heroin was destined for the United States, and that he was aware the heroin sample and future quantities to be delivered were of distribution quantity.  Moreover, by repeatedly assuring the UC and CI during the heroin discussions that he had the continued ability and contacts to provide the UC with large quantities of cocaine transported from Bolivia or elsewhere to the United States, ZAITAR intended to demonstrate his bona fides as an experienced drug trafficker and legitimate partner with the knowledge to distribute drugs internationally, including heroin.

Fourth, recordings wherein ZAITAR explained how he and his associates could either transport or package the cocaine, for example, in shipped containers or via drug couriers or mules carrying the cocaine in hidden luggage compartments, is probative of the common scheme, plan, or *modus operandi* of ZAITAR's heroin organization and its intended international scope of the

distributions; it also reflects ZAITAR's knowledge to distribute drugs internationally in a manner to evade detection.  Some of the same transport methods were proposed by ZAITAR for the heroin transactions; ZAITAR also discussed these methods with ZHAYTER.  These statements further served to affirm ZAITAR's assertions he had a viable international drug trafficking network capable of obtaining and successfully transporting large quantities of drugs.  Because ZAITAR offered the same methods of transportation for the heroin in his discussions with the UC and CI, it confirms the organization's familiarity with the use of drug couriers or mules to transport multiple kilograms of heroin overseas, again lending credibility to his and his associates, including ZHAYTER's and their other brothers' and relatives', ability to supply the heroin the UC desired.

Similarly, ZHAYTER's wiretapped communications with ZAITAR about lending ZAITAR his own mules for the heroin transactions or ZHAYTER's communications with the CI about obtaining mules for him (ZHAYTER), to the extent ZHAYTER's mules were to be used for cocaine trafficking, are also probative of ZAITAR's and ZHAYTER's close relationship and specific roles in the conspiracy and the structure of the organization.  In addition, the recordings explain how and why ZHAYTER became involved in the heroin conspiracy and demonstrate his knowing and intentional participation; his role as a manager and recruiter of others, including drug mules, to facilitate the conspiracy's object; his awareness that the substance to be transported was heroin and of distribution quantity; the common scheme, plan, or *modus operandi* used by ZAITAR and ZHAYTER to traffic drugs; the intended international scope of the distribution; and his knowledge and ability to transport and distribute drugs internationally in a manner to evade detection.  The discussions about ZHAYTER lending money to ZAITAR and

ZHAYTER's property being held by Zouhair ZEAYTER, perhaps for debts owed, is also a basis for ZHAYTER's motive to join the conspiracy, *i.e.*, to reap profits from the multi-kilogram heroin deals planned or to recoup any money ZHAYTER loaned to ZAITAR so as to repossess his building from Zouhair ZEAYTER.

Fifth, money laundering and the movement of money is inherent in any drug trafficking conspiracy. ZAITAR's wiretapped discussions with his associates, including ZHAYTER, on the manner and method of transporting the money received from the sale of the heroin is intrinsic to the conspiracy. Large scale drug trafficking generates tremendous amounts of cash which must be returned to the owners of the drugs, either through bulk cash delivery or more sophisticated methods of money laundering, such as was discussed in the calls with Samir ZEAITER, to include through the purchase and sale of expensive goods such as vehicles. Furthermore, their discussions about the various places to send the drug proceeds, *e.g.,* to Lebanon, discloses the organization's presence in Lebanon and further defines the scope of the drug trafficking organization. The money laundering calls with Samir ZEAITER or others also identify the relationship between the parties (it is believed ZAITAR, ZHAYTER, and Samir ZEAITER are brothers-in-law or cousins), how Samir ZEAITER became involved in the conspiracy (to aid in the movement of the illicit drug money due to his bank connections), his knowledge of money laundering techniques, and the organization's plans to distribute contraband on an international scale, requiring international movements of money.

More seemingly generic recordings where salutations and greetings were made or where telephone numbers were exchanged help to or expressly identify participants in the conspiracy and indicate the defendants' direct knowledge of and illicit relationship with organizational

members.

That ZAITAR previously participated in a conspiracy with AWALI to distribute export quantities of cocaine for importation into the United States and the specific evidence surrounding the controlled buy conducted in Paraguay on October 6, 2007, is also highly relevant to demonstrate with regard to the charged offense that ZAITAR knowingly and intentionally joined, albeit with other conspirators than in the cocaine case, a heroin related importation conspiracy. In addition, ZAITAR's provision of a test sample of confirmed cocaine makes it more probable that he also intended to distribute a test sample of actual heroin to the UC, that he intended and knew the heroin was destined for the United States, and that he was aware the heroin sample and future quantities to be delivered were of distribution quantity. The concealment of the cocaine in a suitcase to evade detection is also probative of the common scheme, plan, or *modus operandi* of ZAITAR's drug organization and of its intended international scope of the distributions and knowledge to distribute drugs internationally in a manner to evade detection.  The evidence also supports that ZAITAR's organization was familiar with the use of drug couriers or mules to transport multiple kilograms of drugs overseas, again lending credibility to his and his associates, including his brothers', ability to supply the heroin the UC desired.  Thus, videos, photographs, forensic analyses, documentation and witness testimony relating to the October 6, 2007 controlled buy of one kilogram of cocaine is evidence inextricably intertwined with the charged heroin trafficking conspiracy.

That to the extent that the evidence developed from the August 6, 2008 executed arrest and search warrants in Paraguay, or the forensic analyses conducted thereafter, helped to identify the conspiracy and the drug trafficking organization involved, its members, structure, and activities,

22

or its common scheme, plan, or *modus operandi*, the government may seek to admit the evidence at trial.  Evidence of drug ledgers, travel documentation, telephone contacts or communications, and paraphernalia used to package ingestable balloons of drugs (for swallowing by drug mules) or to prepare and package drugs for distribution are indicative of the organization's membership and structure and ZHAYTER's or other conspirators' intent and participation in a conspiracy to distribute export quantities of drugs internationally.  Such evidence lends credibility to ZAITAR's and ZHAYTER's ability to supply the heroin the UC desired.  The videos, photographs, forensic analyses, documentation and certain witness testimony and defendant statements received in the MLATs that related to the August 6, 2008 arrests and search warrants reflects evidence inextricably intertwined with the heroin trafficking conspiracy charged.

Finally, ZAITAR's post-arrest statements also are intrinsic to the offense charged.  For instance, ZAITAR's statements help to identify members of the heroin conspiracy and ZAITAR's familial or other relationship to them; the statements also demonstrate his involvement with cocaine trafficking, his intent to participate in a heroin importation conspiracy (the business discussed in Chile), his intent and knowledge to traffic drugs internationally using luggage to conceal the contraband, and his knowledge of the use of mules to transport heroin.

## II.   Even If Not Inextricably Intertwined, The Foregoing Evidence Is Nevertheless Admissible Under Rule 404(b).

In the instant case, in the event that this Court disagrees that the evidence discussed above is "intrinsic" to the charged offense, it should nevertheless be deemed relevant and admitted for the following permissible purposes:  proof of intent, motive, opportunity, plan, knowledge, identity or absence of mistake or accident.

Determining which of a defendant's acts are so intertwined with the charged crime as to be intrinsic evidence, has been described as "a difficult and often a frustrating task." *United States v. Khanu*, 664 F.Supp. 2d 80, 82 (D.D.C. 2009).  Thus, the government recognizes that the evidence described herein may be analyzed under 404(b) as evidence of "other acts." *Id.* at 81.  If the evidence is not intrinsic to the crime charged, it is generally admissible under Rule 404(b) for any valid purpose, other than to prove the defendant's propensity to commit similar acts. *Id.* at 82.  The government is not limited to the purposes enumerated in Rule 404(b), as evidence can be offered for many valid purposes. *United States v. Morrow*, Crim. No. 04-355, Slip op., 2005 WL 3159572, *6 (D.D.C. April 7, 2005) (Kollar- Kotelly, J.).

The U.S. Court of Appeals for the District of Columbia Circuit has established a two-step test for determining whether 404(b) evidence of other criminal activity is properly admitted in a criminal trial. *United States v. Clarke*, 24 F.3d 257, 264 (D.C. Cir. 1994); *United States v. Douglas*, 482 F.3d 591, 596 (D.C. Cir. 2007); *United States v. Bowie*, 232 F.2d 923, 930 (D.C. Cir. 2000).  "The first step requires that the evidence be probative of some material issue other than character. *See* Fed. R. Evid. 404(b).  The second step requires that the evidence not be inadmissible under Rule 403." *Clarke*, 24 F.3d at 264 (citing *United States v. Washington*, 969 F.2d 1073, 1080 (D.C. Cir. 1992)), *cert. denied*, 507 U.S. 922 (1993).  Although stated as a rule of restriction, the Rule is actually one of "inclusion rather than exclusion." *United States v. Cassell*, 292 F.3d 788, 792 (D.C. Cir. 2002); *Bowie*, 232 F.2d at 929.  In *United States v. Crowder*, 141 F.3d 1202, 1206 (D.C. Cir. 1998) (*en banc*), *cert. denied*, 525 U.S. 1149 (1999), the Court of Appeals noted that:

We have recognized before that although the first sentence of Rule 404(b) is

24

> "framed restrictively," the rule itself is "quite permissive," prohibiting the admission of other crimes evidence "in but one circumstance" – for the purpose of proving that a person's actions conformed to his character.  *United States v. Jenkins*, 928 F.2d 1175, 1180 (D.C. Cir. 1991).

*Crowder*, 141 F.3d at 1206.  Thus, if the evidence is deemed relevant, the Court should exclude

the evidence only if its probative value "is substantially outweighed by the danger of prejudice."

Fed. R. Evid. 403.  In *United States v. Long*, 328 F.3d 655 (D.C. Cir.), *cert. denied,* 540 U.S.

1075 (2003), the Court stated:

> "Rule 404(b)'s terminology 'other crimes, wrongs, or acts' includes conduct that is neither criminal nor unlawful if it is relevant to a consequential fact." 2 Weinstein's Federal Evidence § 404.20[2][a] (2d ed.2003) (footnote omitted). The other activity need not have resulted in a charge or conviction; indeed, the defendant may even have been acquitted of the conduct, or the conduct may have been entirely lawful. *Id.* § 404.21[2][b]. What matters is that the evidence be relevant "to show a pattern of operation that would suggest intent" and that tends to undermine the defendant's innocent explanation. 2 Weinstein's Federal Evidence § 404.22[1][a]. Thus, this court has opined, "the admissible bad acts evidence need not show incidents identical to the events charged, so long as they are closely related to the offense," *United States v. DeLoach*, 654 F.2d 763, 769 (D.C. Cir.1980), and are probative of intent rather than mere propensity.

*Long*, 328 F.3d at 661.  As the D.C. Circuit also stated in *United States v. Cassell*, 202 F.3d 788

(D.C. Cir. 2002), *cert. denied*, 129 S.Ct. 1038 (2009), in close cases, Rule 403,

> "tilts, as do the rules as a whole, toward the admission of evidence in close cases," even when other crimes evidence is involved. *United States v. Moore,* 732 F.2d 983, 989 (D.C. Cir.1984). In performing the balancing test required under Rule 403, "it is a sound rule that the balance should generally be struck in favor of admission when the evidence indicates a close relationship to the event charged." *Id.* (quoting *United States v. Day,* 591 F.2d 861, 878 (D.C. Cir.1978)).

*Cassell*, 292 F.3d at 795.

The government submits that the proposed evidence and testimony meets the first step of

the analysis and is probative of some material issue other than character. Again, as explained in

detail *supra*, the evidence of ZAITAR's or ZHAYTER's prior cocaine negotiations and distribution are relevant and admissible as evidence of the defendants' intent, motive, opportunity, knowledge, or a common scheme or plan as it relates to the heroin importation conspiracy. *See, e.g., United States v. Latney*, 108 F.3d 1446, 1448 (D.C. Cir.), *cert. denied*, 522 U.S. 940 (1997) (404(b) analysis also applies to evidence of a later drug transaction and is relevant as evidence of the defendant's intent and knowledge). Knowledge of the controlled substance and intent to distribute are "well established non-propensity purposes for admitting evidence of prior crimes or acts." *United States v. Douglas*, 482 F.3d 591, 597 (D.C. Cir. 2007) (quoting *United States v. Bowie*, 232 F.3d 923, 930 (D.C. Cir. 2000)). *See also United States v. Ono*, 918 F.2d 1462 (9th Cir. 1990) (prior heroin conviction relevant to show intent and knowledge to distribute synthetic heroin and noting "[w]hen the prior act evidence is admitted to show intent, the prior act offered must be similar to the present offense"), *cert. denied*, 510 U.S. 1063 (1994); *United States v. Huff*, 959 F.2d 731, 736-37 (8th Cir.) (evidence of defendant's prior cocaine transaction was relevant to prove intent and common scheme or plan), *cert. denied*, 506 U.S. 855 (1992); *United States v. Jones*, 248 F.3d 671, 675 (7th Cir.) (prior drug distribution is relevant to prove intent to distribute drugs and knowledge that a particular substance is a narcotic drug), *cert. denied*, 534 U.S. 926 (2001).

Moreover, the evidence from the foreign drug seizures and from the arrest and search warrants conducted on or about October 6, 2007 and August 6, 2008, are likewise relevant to show the defendants' knowledge of and intent to smuggle drugs internationally, including into the United States, as further described above. *See United States v. Mitchell*, 49 F.3d 769, 775-772 (D.C. Cir.) (evidence of defendant's uncharged methamphetamine deal, transpiring late in course

of charged cocaine conspiracy, not direct evidence of charged conspiracy; nonetheless, evidence properly admitted under Rule 404(b) where deal was contemporaneous with charged defendant's "second" involvement with cocaine conspiracy and judge gave proper limiting instruction at close of testimony), *cert. denied*, 516 U.S. 926 (1995).  The evidence also demonstrates the common scheme, plan or *modus operandi* of transporting drugs via drug mules or couriers; the same as in the heroin importation conspiracy. *United States v. Gaviria*, 116 F.3d 1498, 1532-33 (D.C. Cir. 1997) (other uncharged crime evidence of prior distribution of heroin properly admitted in cocaine conspiracy case where "it shows or tends to show the defendants had a common scheme or plan which included the offenses for which they are now charged."), *cert. denied*, 522 U.S. 1082 (1998).

Finally, ZAITAR's post-arrest statements also show his intent to participate in a heroin importation conspiracy (the business discussed in Chile), his intent and knowledge to traffic drugs internationally using luggage to conceal the contraband, and his knowledge of the use of mules to transport heroin, all acceptable and relevant bases for admitting the evidence under Rule 404(b) and the first step of the analysis.

### III.  The Probative Value of Admitting the Identified Evidence Outweighs Any Prejudicial Effect

Rule 403 of the Federal Rules of Evidence provides:

Although relevant, evidence may be excluded it its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

Fed. R. Evid. 403.  However, the D.C. Circuit has said:

Rule 403 does not provide a shield for defendants who engage in outrageous acts,

27

> permitting only the crimes of Casper Milquetoasts to be described fully to a jury.
> It does not generally require the government to sanitize its case, to deflate its
> witnesses' testimony, or to tell its story in a monotone.  It does not bar powerful,
> or even "prejudicial" evidence.  Instead, the Rule focuses on the "danger of *unfair*
> prejudice," and gives the court discretion to exclude evidence only if that danger
> "*substantially* outweigh[s] the evidence's probative value."

*United States v. Gartmon*, 146 F.3d 1015, 1020 (D.C. Cir. 1998) (affirming the admission of

evidence that the defendant, who was charged with fraud, had placed a gun at a wavering co-

conspirator and threatened her) (internal citations omitted).  *Id.* at 1021 ("There is no question

but that the conduct portrayed by the testimony was outrageous, and that it may dramatically

have injured Gartmon's cause. But that is not sufficient reason to exclude the testimony.").  In

the context of Rule 404(b) evidence, the Rule 403 analysis is case-specific.  The trial courts have

wide discretion in determining whether evidence is admissible under Rule 404(b), and should

exclude the permissible and relevant evidence under Rule 403 only if its probative value "is

substantially outweighed by the danger of unfair prejudice."  Fed. R. Evid. 403.  In conducting

the balancing test between Rules 404(b) and 403, the D.C. Circuit explained:

> [T]he concern about "prejudice" focused on the danger of the jury using the other
> crimes evidence in a way the rules do not permit – to conclude that because the
> defendant committed some other crime, he must have committed the one charged
> in the indictment.
>                                    ....
> In adopting the Federal Rules of Evidence, Congress "was not nearly so concerned
> with the potential prejudicial effect of Rule 404(b) evidence as it was with
> ensuring that restrictions would not be placed on the admission of such evidence."
> [citation omitted].  As to Rule 403, each case will turn on the discretionary
> judgment of the trial court and its assessment, not of relevance, but of the
> evidentiary value of the government's Rule 404(b) evidence.  On the same side of
> the balance, the trial court will take into account the effect of a limiting jury
> instruction to protect the rights of the accused.  See Fed. R. Evid. 403, advisory
> committee notes.

*Crowder*, 141 F.3d at 1210.  Thus, the danger that this Court must weigh is not the likelihood

that the other crimes evidence will weaken the defendants' defense, but rather the danger that the jury will misuse the evidence by inferring that, merely because the defendants engaged in these prior bad acts, they are prone to commit the crime charged; but the district court can take "caution to guard the space between the permissible and impermissible inferences by instructing the jury to consider the evidence only for its proper purpose." *United States v. Mitchell*, 49 F.3d 769, 777 (D.C. Cir.), *cert. denied*, 516 U.S. 926 (1995). Not surprising then, a trial court's 404(b) ruling is afforded "much deference on review," and is reviewed only for an abuse of discretion. *United States v. Linares,* 367 F.3d 941, 946 (D.C. Cir. 2004); *United States v. Cassell*, 292 F.3d 788, 792 (D.C. Cir. 2002). Further, the law in this Circuit is clear that in balancing the probativeness and prejudice of other crimes, "it is a sound rule that the balance should generally be struck in favor of admission when the evidence indicates a close relationship to the offense charged." *United States v. Harrison*, 679 F.2d 942, 948 (D.C. Cir. 1982) (citation omitted).

In this case, the evidence of the cocaine-related recordings, foreign drug seizures and arrest and search warrants, post-arrest statements, and other generally identified prior criminal activity or statements, are integral to the charged conspiracy. To be sure, evidence of prior drug transactions is routinely admitted in drug cases, as noted *supra*. Although evidence of the defendants' involvement in drug trafficking involving a different controlled substance may be inculpatory, it is not unfairly or dangerously prejudicial. Instead, it is highly probative evidence demonstrating intent, motive, opportunity, knowledge, or a common scheme or plan as it relates to the heroin importation conspiracy, each of which carry substantial evidentiary value. This decisively tips the balance in favor of admission. Further, any potential prejudice can be

ameliorated by given the jury a limiting instruction in accordance with Rule 404(b) which eliminates all concern that the jury would misinterpret the evidence.

<u>**CONCLUSION**</u>

In conclusion, the government intends to offer the foregoing evidence that ZAITAR and ZHAYTER, along with other conspirators, engaged in drug transactions and other acts, during or subsequent to the charged conspiracy. This evidence is relevant and admissible as direct and intrinsic evidence of the charged heroin importation conspiracy, and does not constitute "other crimes" evidence.

Even if the Court were to find that these transactions were "other crimes" evidence, it is nonetheless admissible under Federal Rule of Evidence 404(b). A limiting instruction to the jury would ameliorate any potential prejudice.

**WHEREFORE**, the government submits that this evidence should be admitted at trial.

Respectfully submitted,

ARTHUR G. WYATT, Chief
Narcotic and Dangerous Drug Section

By:        */s/ Meredith A. Mills*
           Meredith A. Mills (D.C. Bar # 457843)
           Trial Attorney
           Narcotic and Dangerous Drug Section
           U.S. Department of Justice / Criminal Division
           1400 New York Avenue, NW
           Washington, DC 20005
           Main Office: (202) 514-0917
           Fax: (202) 514-0483
           Meredith.Mills@usdoj.gov

<u>CERTIFICATE OF SERVICE</u>

        I hereby certify that on the 8th day of August 2011, I filed the foregoing
GOVERNMENT'S NOTICE TO THE DEFENDANT AND MOTION TO ADMIT EVIDENCE
OF OTHER CRIMES PURSUANT TO RULE 404(b) OF THE FEDERAL RULES OF
EVIDENCE with the Clerk of the Court via the CM/ECF system which will deliver a Notice of
Electronic Filing on the following:

<u>Counsel for Defendant YAHYA ALI ZAITAR</u>
Jenifer Wicks, Esquire
Law Offices of Jenifer Wicks
The Webster Building
503 D Street, NW, Suite 250A
Washington, DC 20001-2728
Telephone: (202) 393-3004 / Fax: (202) 478-0867
Email: jenifer.wicks@verizon.net

<u>Counsel for Defendant NEMR ALI ZHAYTER</u>
Carmen D. Hernandez, Esq.
7166 Mink Hollow Road
Highland, MD 20777
Telepehone: 202-628-0090 / Direct: 240-472-3391 / Fax: 202-628-2881
chernan7@aol.com



                        By:        /s/ *Meredith A. Mills*
                                   Meredith A. Mills (D.C. Bar # 457843)
                                   Trial Attorney
                                   Narcotic and Dangerous Drug Section
                                   U.S. Department of Justice / Criminal Division
                                   1400 New York Avenue, NW
                                   Washington, DC 20005
                                   Main Office: (202) 514-0917
                                   Fax: (202) 514-0483
                                   Meredith.Mills@usdoj.gov