UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No.: 1:08cr214 (RMC) |
| | ) | |
| NEMR ALI ZHAYTER, | ) | **Sentencing Date: June 14, 2012, 10:00 a.m.** |
| a/k/a "Shadi," | ) | |
| | ) | |
| Defendant. | ) | |

**POSITION OF THE UNITED STATES
WITH RESPECT TO SENTENCING FACTORS**

The United States of America, through undersigned counsel, and in accord with 18

U.S.C. § 3553(a) and the United States Sentencing Commission, *Guidelines Manual,* § 6A1.2

(Nov. 2011), files this Position of the United States with Respect to Sentencing Factors in the

instant case and in response to the Defendant's Memorandum in Aid of Sentencing ("Def.

Memo"), filed June 12, 2012.  The United States submits that the Sentencing Guidelines

establish a reasonable sentencing range of 70-87 months that appropriately accounts for each of

the factors set forth in 18 U.S.C. § 3553(a). Further, the government respectfully requests that

this Court impose a sentence on the defendant of 70 months, for the reasons herein stated.

**BACKGROUND**

On July 17, 2008, a Grand Jury sitting in this district returned a then-sealed original one-

count indictment against the defendant charging him with conspiracy to import 1 kilogram or

more of heroin into the United States and distribute 1 kilogram or more of heroin, intending and

knowing that such substance would be unlawfully imported into the United States, in violation of

21 U.S.C. §§ 963, 952, and 959(a) and 18 U.S.C. § 2.  The defendant was arrested in Paraguay in

connection with the offenses on or about August 6, 2008, and remained in custody from that time

until his extradition to the United States and appearance in this district for his Rule 5 and detention hearings and arraignment on February 25, 2011.

On May 2, 2012, shortly before trial, the defendant pleaded guilty to a one-count Criminal Information charging him with conspiracy to import 100 grams or more of heroin into the United States and distribute 100 grams or more of heroin, intending and knowing that such substance would be unlawfully imported into the United States, in violation of 21 U.S.C. §§ 963, 952, and 959(a) and 18 U.S.C. §2. The defendant was held accountable under the plea to conspiring to import or distribute at least 1 kilogram but less than 3 kilograms of heroin (Base Offense Level 32).

The defendant's prosecution arose out of an investigation conducted by the Drug Enforcement Administration ("DEA") and Paraguayan and Brazilian law enforcement authorities into several drug trafficking organizations ("DTO") operating in the Tri-Border area of Paraguay, Brazil, and Argentina. One of the targets of that investigation became the defendant's brother, Yahya Ali Zaitar (hereafter "Zaitar").

Starting in May 2007, and on numerous occasions thereafter, Zaitar agreed in recorded conversations to sell multiple kilogram quantities of cocaine and heroin to a DEA informant's "boss" (an undercover law enforcement agent ("UC")) for distribution to customers in the United States. Relevant to the instant case, Zaitar agreed to distribute at least 50 kilograms of heroin to the informant and the agent, including by sending it directly to New York by plane. After Zaitar participated in several recorded telephone calls with the UC to negotiate supplying the agent with large quantities of heroin for importation into the United States, Zaitar met with the UC and the informant in Santiago, Chile to discuss the future heroin transactions. While there, Zaitar agreed

2

to sell the undercover agent a three kilogram sample of high-quality heroin for $40,000 in U.S. currency for distribution in the United States.  The heroin was to be supplied by Zaitar's Lebanon-based brother.  Zaitar told the agent that he (Zaitar) could thereafter supply at least 40 kilograms of heroin by concealing 10 kilograms in luggage and having a courier transport two pieces of luggage or 20 kilograms of heroin at a time. Thereafter, in subsequent telephone calls and meetings, Zaitar, the informant, and the UC agreed to meet in Bucharest, Romania to further negotiate the heroin transaction and finalize plans for transport.  All three traveled to Romania the second week of April 2008 for those purposes.

When the investigation into Zaitar began, the defendant was also a member of a narcotics trafficking organization ("DTO") operating in the Tri-Border Area and in various locations in the Europe and the Middle East.  The defendant primarily trafficked multiple kilogram quantities of cocaine to Europe using drug mules or couriers which he recruited.

As part of his guilty plea, the defendant admitted that in or about early April 2008, he became aware that his brother, Zaitar, had traveled to Bucharest, Romania to meet in person with a potential large scale heroin buyer (the UC) to discuss a multiple kilogram quantity deal.  While Zaitar was in Romania negotiating the deal, Zaitar called upon the defendant to assist him in the trafficking scheme, and the defendant and Zaitar discussed by telephone the logistics of the transaction on numerous occasions.  These calls were intercepted pursuant to a lawful court-authorized wiretap conducted by Romanian law enforcement authorities.

In those calls, the defendant agreed to assist Zaitar in coordinating the transport of a one to three kilogram sample of high quality heroin ("test sample") from their drug associates in the Middle East for delivery by a courier to Zaitar and the buyer (the UC) in Bucharest, Romania.

The defendant knew that the heroin sample was destined for importation into the United States for distribution purposes.

The defendant agreed during the calls with Zaitar to procure the drug couriers to transport and deliver the heroin sample from Lebanon to Romania, plan the courier's itinerary, obtain the requisite travel documents, and pay the couriers' travel costs and smuggling fees. The defendant recruited or attempted to recruit several couriers to transport the heroin to Zaitar.

The defendant also agreed during the calls to consult, and did consult, on Zaitar's behalf, with other organizational members and a source of supply, in order to obtain information on the price and availability of a kilogram of heroin, the supplier's ability to fulfill the test sample order during the week Zaitar was in Romania, and the logistics for the transport of the heroin from the supplier in Lebanon. The defendant and Zaitar discussed the various price quotes received which ranged from 16,000 Euros to 28,000 Euros per kilogram of heroin. Defendant and Zaitar also arranged together for the down payment to the Lebanon-based supplier to manufacture the heroin, and planned how the money for the heroin purchase would be transferred to the DTO from America by the buyer. The defendant periodically reported to Zaitar on the status of the manufacture and transport of the heroin sample from Lebanon after talking with the Lebanon-based organizational members. In addition, at Zaitar's direction, the defendant also coordinated the organizational members' quality testing and packaging of the heroin into a suitcase for delivery to Zaitar.

During the wiretapped calls, the defendant and Zaitar also discussed the future multi-kilogram quantities of heroin to be purchased by the buyer from the DTO for importation into the United States, after the sample was delivered. After a week in Romania, Zaitar was arrested on

4

April 14, 2008, before the heroin test sample could be delivered to Bucharest.

In the Pre-Sentence Report, the U.S. Probation Office calculated a base offense level 32 (representing the level associated with a drug quantity of at least 1 kilogram but less than 3 kilograms of heroin), plus a two level reduction for "Safety Valve," pursuant to 18 U.S.C. § 3553(f) and U.S.S.G. § 5C1.2, minus three levels for acceptance of responsibility. Thus, at Total Offense Level 27 / Criminal History Category I, the defendant faces 70-87 months. The government agreed as part of the plea to seek a sentence of 70 months.

## ARGUMENT

Under the Sentencing Reform Act, as interpreted by the Supreme Court's decision in *United States v. Booker*, 543 U.S. 220 (2005), the district courts follow a two-step process when imposing a sentencing on a defendant. First, the Court must properly calculate and consider the defendant's Sentencing Guideline range. *Booker*, 543 U.S. at 245; *United States v. Coumaris*, 399 F.3d 343, 351 (D.C. Cir. 2005); *United States v. Ventura*, 481 F.3d 821, 823 (D.C. Cir. 2007). The Sentencing Guidelines "should be a starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49-50 (2007). The Sentencing Guidelines are advisory, not mandatory. *United States v. Motley*, 587 F.3d 1153, 1158 (D.C. Cir. 2009) ("In *Booker*, the Supreme Court excised the statutory section that had made the Guidelines mandatory, thus rendering them advisory"); *United States v. Dorcely,* 454 F.3d , 366, 375 (D.C. Cir. 2006) ("In a post-*Booker* world, the [sentencing] court must calculate and consider the applicable Guidelines range but is not bound by it.").

However, the Sentencing Guidelines are not the only consideration. In the second step, the Court must "tailor the sentencing in light of other statutory factors as well." *Booker*, 543

U.S. at 245; *Coumaris*, 399 F.3d at 351.  Those statutory factors include, as set forth in 18 U.S.C.

§ 3553(a):

> (1)    the nature and circumstances of the offense and the history and characteristics of the defendant;

> (2)    the need for the sentence imposed to reflect the seriousness of the offense, promote respect for the law, provide just punishment, afford adequate deterrence to criminal conduct, protect the public from further crimes by the defendant, and provide the defendant with rehabilitation, education and training, and other correctional treatment; and

> (3)    the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct.

*Gall*, 552 U.S. at 49-50; *Booker*, 543 U.S. at 245.  The District Court "may not presume that the

Guidelines range is reasonable."  *Gall*, 552 U.S. at 50, citing *Rita v. United States*, 551 U.S. 338,

351 (2007).  Instead, the Court at sentencing must make an "individualized assessment based on

the facts presented."  *Gall*, 552 U.S. at 50.

In *United States v. Motley*, 587 F.3d at 1158, the Court noted that "most (but not all)

circuits have held that calculating the Guidelines sentence includes taking into account any

traditional Guidelines-based departure."  *See e.g., United States v. Vazquez-Lebron*, 582 F.3d

443, 445 (3d Cir. 2009) (requiring sentencing court to calculate guideline range, state on the

record whether any departure was being granted and, if so, how such departure affects guideline

calculation, and then exercise discretion by considering § 3553(a) factors when imposing final

sentence).  Accordingly, the instant Sentencing Memorandum sets forth the government's

calculation of the sentencing range pursuant to the Guidelines.  Then, the government sets forth

its analysis of the appropriate sentence based on the factors set forth in 18 U.S.C. § 3553(a).

I.      **The Probation Office Correctly Calculated the Defendant's Sentencing Guidelines Range To Be 70-87 Months.**

The government submits that, as determined in the Preliminary and Amended Pre-Sentence Report (PSR), the defendant's Total Offense Level is **27**, Criminal History I, with a Sentencing Range of **70-87** months.  *See* Amended Presentence Investigation Report ("Amended PSR") at ¶ 52, filed June 7, 2012.  The Probation Office agreed with the parties' stipulated Guidelines factor holding the defendant accountable for at least one kilogram but less than three kilograms of heroin (Base Offense Level **32**).  Amended PSR at ¶ 38.  The Probation Officer also determined that the defendant's conduct did not support a mitigating or aggravating role adjustment.  Amended PSR at ¶ 32.  This is also consistent with the parties' stipulated Guidelines factors as reflected in the defendant's Plea Agreement.  The Probation Officer assessed a two-level reduction pursuant to 18 U.S.C. § 3553(f) and U.S.S.G. § 5C1.2 following the government's representation that the defendant was eligible for the reduction after having met all of the "Safety Valve" criteria.  Amended PSR at ¶ 39, 55.   The Probation Office included a three-point downward adjustment for acceptance of responsibility.   Amended PSR at ¶ 45, 46. The government intends to move for awarding of the third acceptance point pursuant to U.S.S.G. § 3E1.1(b) at the time of sentencing.  The parties agreed in the Plea Agreement that neither would seek a downward or upward departure.  The Probation Office did not impose any departures in the PSR.  Finally, the Probation Officer determined that the defendant's zero criminal history points placed him in Criminal History Category I.  Amended PSR at ¶ 50.  Thus, the defendant's sentencing range is **70-87 months**.  This is the appropriate starting point for the sentencing analysis.

II.     **The Guidelines Range of 70-87 Months, and a Specific Sentence of 70 Months Incarceration, Also Complies with the Factors and Considerations Set Forth in 18 U.S.C. § 3553(a)**.

After applying the Sentencing Guidelines, the Court must then consider the factors set forth in 18 U.S.C. § 3553(a), including the nature and circumstances of the offense, the history and characteristics of the defendant, and the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law and just punishment, to afford adequate deterrence, to protect the public from further crimes of the defendant, and to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner. The government respectfully submits that a sentence of 70 months imprisonment is sufficient, but not greater than necessary to accomplish these objectives.

A.     **Nature and Circumstances of the Offense**

The defendant committed a serious crime against the United States. While the defendant pleaded guilty to a Criminal Information charging a conspiracy to import and distribute 100 grams or more of heroin intending and knowing that it would be illegally imported into the United States, in his Plea Agreement the defendant admitted to conspiring to import or distribute one to three kilograms of heroin.  This heroin was to be transported from Lebanon to the defendant's brother in Romania for subsequent distribution to a buyer who, the defendant believed, was going to transport the heroin to the United States for distribution in New York. Although the defendant's involvement in the conspiracy spanned a week, his role during that time was significant and critical to the completion of the initial "test sample" transaction and, thus, the planned transactions for larger heroin quantities which were to occur thereafter.

8

Notably, it was the defendant to whom Zaitar turned to recruit several of his (the defendant's) own drug couriers to transport and deliver the heroin sample from Lebanon to Romania.  In turn, the defendant actively and aggressively undertook that coordination, by identifying couriers to enlist, obtaining their itinerary and travel documents, and ensuring with Zaitar the payment of their travel costs and smuggling fees. The defendant also served as Zaitar's primary consultant with the Lebanon-based organizational members and source of supply. To that end, the defendant obtained heroin pricing and availability information, coordinated certain logistics for the transport of the heroin from the supplier in Lebanon to Zaitar (including the down payment for its manufacture and the quality-testing and packaging of the heroin), and frequently reported back to Zaitar the efforts he was undertaking to ensure the transaction succeeded.  The defendant and Zaitar also discussed how the American buyer would make payments to the DTO for the heroin and the defendant offered to have the buyer send the money to his account.  The defendant and Zaitar also discussed the future multi-kilogram quantities of heroin to be purchased by the buyer (the UC) from the DTO for importation into the United States, after the sample was successfully delivered.

Although Zaitar was arrested before the test sample of heroin could be delivered to him in Bucharest, the defendant's participation in a scheme to import heroin into the United States or to distribute it, intending or knowing its importation into the United States, shows a complete disregard for U.S. law prohibiting drug trafficking (as well as those of the countries any courier would cross while transporting the drugs).  Moreover, the defendant's agreement to provide and coordinate the drug couriers also shows a deliberate intent to place others at significant risk for arrest and imprisonment in foreign countries as a result of their smuggling drugs, and likely for a

term of years much greater than what the defendant now faces or his counsel advocates.  This

risk would be all the more dangerous for any courier whose method of carrying was via internal

ingestion.

In addition, heroin is a highly addictive narcotic drug that is abused at a significant cost to

the users, their families, the medical community, law enforcement, and society in general.  Lives

are ruined, families are torn apart, jobs are lost, and medical resources are stretched to the limit.

The defendant knew that the heroin to be transported to Bucharest was just a sample to enable the

buyer to test the quality in the U.S. market and that larger quantities would be transacted later for

importation into and distribution within the United States.

Thus, the defendant's crime against the United States is extremely serious. That this is the

defendant's first conviction for or known involvement in trafficking drugs to the United States

does not mitigate the seriousness of the offense.  The nature and circumstances of the conspiracy

and the type and quantity of drugs to be distributed warrants a Guidelines sentence of 70 months.

Such a sentence will reflect the seriousness of the offense, promote respect for the law, provide

just punishment for the offense, afford adequate deterrence to criminal conduct by the defendant

and others who would engage in such illegal conduct and protect the public from further crimes

of the defendant.  To be sure, a sentence to time served or even 54 months, as the defendant

proposes, would dismiss the gravity of the defendant's participation in the conspiracy and

encourage other foreign drug traffickers to transport heroin to the United States with little fear of

punishment.  It is worth noting that in the absence of a Criminal Information alleging a 100

grams or more conspiracy or the defendant's eligibility under the Safety Valve provisions, the

defendant would face at least a mandatory minimum term of ten years for his involvement in a 1

to 3 kilogram heroin conspiracy.

### B.     History and Characteristics of the Defendant

The defendant is a 33-year old Lebanese male who was residing in Paraguay at the time

of his involvement in the conspiracy and his arrest on the government's Provisional Arrest

Warrant.  As a truncated PSR was ordered and prepared at the defense's request, however, there

is no information in the report on the defendant's childhood, family history, employment, or any

other personal history factors which would support any defense claim that the defendant's history

and characteristics are remarkable and warrant a downward variance sentence to time served or

54 months.  Instead, the defendant's history and characteristics support the government's

proposed Guidelines sentence of 70 months.

### Defendant's History as a Drug Trafficker

First, the defendant was enlisted by his brother Zaitar, nearly immediately upon his arrival

to Bucharest, to recruit and coordinate the drug couriers. This shows the defendant had prior

knowledge of and experience with trafficking drugs through the use of couriers.  The

government's evidence supports that the defendant was also involved in cocaine trafficking in

Paraguay at the time of the conspiracy.  For instance, on one occasion in late March 2008, the

defendant asked the informant to assist with the travel plans for two drug mules whose

destination was Europe or the Middle East.  The defendant was hopeful that, as part of his

participation in the heroin conspiracy, he would also establish additional cocaine contacts in

Europe through the UC and the informant.  Although the defendant's foreign cocaine trafficking

activity is not the subject of the defendant's underlying indictment, Criminal Information, or

guilty plea, his prior history as a drug trafficker is what caused his brother to involve him in the

conspiracy.  It is also likely his drug trafficking activity in Paraguay is what financially supported

his family.  Thus, while being away from his family may be difficult emotionally and financially,

and the defendant submits that such effects warrant a variance under § 3553(a), *see* Def. Memo at

8-10, it is the foreseeable consequence that this defendant, and nearly every federal defendant,

whether a U.S. citizen or not, intentionally risks and pays for placing more importance on his

illegal activity than that of the welfare of his family.  There is simply nothing remarkable or

exceptional about this defendant's family ties or situation to warrant a variance from a

Guidelines sentence of 70 months.

**The Defendant's "Deportable Alien" Status and the *Smith* Departure**

The defendant also requests a "departure" (or variance) from the Guideline range based

on his status as a deportable alien, pursuant to *United States v. Smith,* 27 F.3d 649 (D.C. Cir.

1994).  Def. Memo at 4-7.  He offers no compelling reason for a departure based solely on his

immigration status, and, indeed, no such departure is warranted in this case.

In *Smith,* a case decided prior to *Booker,* the D.C. Circuit considered whether the

mandatory Guidelines provided a basis for a downward departure. The *Smith* Court held that "a

downward departure *may be appropriate* where defendant's status as a deportable alien is likely

to cause a fortuitous increase in the severity of his sentence." *Smith,* 27 F.3d at 655 (italics

added).  Far from being mandatory, the downward departure in *Smith* was meant to be "highly

infrequent." *Id.*  Following *Booker,* this Court has considerable discretion on the factors it

considers, but the analysis in *Smith* still provides a benchmark for the reasonableness of reducing

a defendant's sentence based on his immigration status.  Using *Smith* as guidance in the instant

case, reducing the defendant's sentence by any amount based on his immigration status is not

reasonable.

First, as the *Smith* Court held, "[f]or a departure on such a basis to be reasonable the difference in severity must be substantial and the sentencing court must have a high degree of confidence that it will in fact apply for a substantial portion of the defendant's sentence." *Id.* This, in turn, requires the defendant to show "that [his] deportable alien status . . . [is] an independent cause of a substantial increment in [the] severity" of his sentence. *Smith*, 27 F.3d at 655. The defense has not met this burden. For instance, it is not clear that in the absence of his deportable alien status the defendant would even be eligible for placement in a minimum security prison or camp for a substantial part of his sentence, as the defense suggests, since the nature of his drug offense would subject him to a "greatest severity" or "moderate severity" offense determination during the Bureau of Prisons classification process. Def. Memo at 4. *See also* Federal Bureau of Prisons Program Statement ("BOP P.S.") P5100.08 ("Inmate Security Designation and Custody Classification"), dated September 12, 2006, at Appendix A at 1, 3 (indicating that offenders who are "part of an organizational network" and "organized or maintained ownership / profits from **large-scale** drug activity" involving amounts which equal or exceed 2000 grams of heroin "will be scored in the Greatest severity category" while those male offenders whose drug activity involved heroin in quantities equal to or more than 80 grams will be classified as "moderate severity") (emphasis in original). Nor has the defense clearly established that his status as a deportable alien is what prevents him from being eligible for certain programs, thereby allegedly resulting in a more severe confinement situation for a substantial amount of his sentence. For example, contrary to the defense's statement, his status as a deportable alien does not bar him from participation in the literacy program, *see* Def. Memo

13

at 4-5, it only means he is not required to participate in the 240 hours program; he may still receive good conduct time as specified in the Program Statement.  *See* BOP P.S. 5350.28 ("Literacy Program (GED Standard)"), dated December 1, 2003, at 8, 10.  Thus, the defense has not demonstrated that the defendant's "fortuity of being a deportable alien is likely to have any independent effect" on the severity of his sentencing.  *Smith*, 27 F.3d at 655.

This difficulty in ascribing "restrictive" facility or program determinations to one's deportable alien status in the BOP classification process was noted by the *Smith* Court and suggests why the Court did not hold that the departure must apply to all deportable alien defendants.  The Court stated:

> The range of factors that the Bureau may consider in its assignments is almost illimitable, . . . . if deportable aliens who are ineligible for minimum security facilities are not so very different from U.S. citizens who are typically assigned to higher security institutions, then it might be hard to say that their status *alone* has caused an increase in severity.

*Id.* (italics in original).  Under defendant's approach, all foreign citizens would receive beneficial treatment for sentencing purposes, even if their crimes were drug trafficking or terrorism crimes directed at the United States. This is unreasonable and not in keeping with the Circuit's directive in *Smith* that the departure apply infrequently.  *Id.*; *see also id.* at 654 (agreeing with the Second Circuit Court of Appeals that "Congress may not have intended [that 18 U.S.C. § 3624(c)]," which "focuses on reentry into a community," "apply to deportable aliens at all").  The D.C. Circuit has continued to recognize that the *Smith* departure is not to be applied automatically. *See, e.g., United States v. Brodie*, 524 F.3d 259 (D.C. Cir. 2008); *United States v. Olivares*, 473 F.3d 1224 (D.C. Cir. 2006); *United States v. Palacios*, 111 F.3d 963 (D.C. Cir. 1994).  Because the defendant has not demonstrated that "Mr. Zhayter will indeed be subject to increased severity

14

in his confinement," *see* Def. Memo. at 4, or that any difference in the severity of his sentence

will be based solely on his alien status, a *Smith* departure is unwarranted.

Second, even assuming the defendant is ineligible for certain programs or facility

assignments as a result of his deportable status, such that it constitutes an increase in the severity

of his sentence, he has not shown that this increased severity will apply for a substantial part of

his sentence. As the defendant notes, he has already served approximately 46 months of any

sentence to be imposed. If the Court imposes a 70 month sentence, as the government seeks, the

defendant would likely only serve 59 months, or 85%, of that sentence after the application of

any "good time" credit.  After deducting the 46 months served to date, the defendant would only

be in BOP custody for 13 months.  Thus, any "severity" in his sentence during those 13 months

would not "in fact apply for a substantial portion" of the defendant's 70 month sentence, as *Smith*

requires.  *Smith*, 27 F.3d at 655.

Third, even if a difference in the severity of his sentence attributed to his deportable alien

status is substantial, the *Smith* Court emphasized that such a finding, standing alone, was

insufficient. The Court firmly stated:

> [W]e do not mean to suggest that a departure is in order whenever a factor
> unrelated to a prisoner's just deserts may affect the severity of his confinement. . .
> . . [E]ven a court confident that the [deportable alien] status will lead to worse
> conditions should depart only when persuaded that the greater severity is
> *undeserved*.

*Smith*, 27 F.3d 649 (italics added); *see also United States v. Olivares,* 473 F.3d 1224, 1231 (D.C.

Cir. 2006) (quoting *Smith*, 27 F.3d at 655).  Notably, the Court "express[ed] no opinion on

whether a departure [was] appropriate" in that case, and remanded the matter for resentencing.

*Smith*, 27 F.3d at 656.  In this case, the only clearly demonstrated "greater severity" imposed on

the defendant by not granting the *Smith* departure is six months additional incarceration time. Compared with what conduct he engaged in, the additional six months is justly deserved as is a sentence of 70 months.  Afterall, the defendant knowingly and intentionally joined with others in targeting the United States as the destination for multi-kilogram quantities of heroin.  In that endeavor, he demonstrated international ties to criminal organizations in Lebanon, Paraguay, Jordan, and elsewhere.  Further, the defendant's role was significant, albeit brief, as he coordinated the manufacture and transport of one to three kilograms of heroin to his brother in Romania so that it could be imported into the United States.  The defendant and his brother intended that following the delivery of the test sample, future transactions for larger heroin quantities, which were also destined for the United States, would be undertaken. Neither the importance of ensuring the delivery of the test sample, nor the defendant's role as the primary individual responsible for ensuring the drugs made it to Zaitar in Romania, can be understated. That the heroin did not arrive by the time Zaitar was arrested was only a function of timing, not the absence of intent and capacity on the defendant's part to fulfill the drug trafficking mission. Moreover, 21 U.S.C. §§ 963, 952, and 959 are meant to apply to extraterritorial conduct and, by their nature, more often than not, result in prosecution of foreign defendants.  These laws do not allow a defendant to avoid the full consequences of his criminal actions by operating outside the jurisdiction of the United States or simply because he is a citizen of another country when he violates the statutes.  Thus, it would be irrational to reward this defendant for the unique nature of his criminal activity simply because he is not also a United States citizen.  Accordingly, a sentence of 70 months is justly deserved here on the basis of the severity of the offense and the

defendant's role in it, making the *Smith* departure inapplicable here.[1]

**Defendant's Pretrial Incarceration Conditions**

The defendant seeks a variance from the Guidelines range under the § 3553(a) factors on the basis of his pretrial holding conditions in Paraguay.  The defendant is prohibited from making any arguments for downward departures from the Guidelines pursuant to the specific language of the Plea Agreement.  In any event, however couched, a reduction in sentence based on pretrial confinement conditions is a "'highly infrequent' and extraordinary measure." *United States v. Sutton*, 973 F. Supp. 488, 495 (D.N.J. 1997); *see also United States v. Shah*, 263 F. Supp. 2d 10, 35 (D.D.C. 2003), *aff'd and remanded*, 453 F.3d 520 (D.C. Cir. 2006).  The defendant has failed to support his argument that a reduction in sentence is a warranted here on the basis of his pretrial custody in Paraguay or the D.C. Jail.

While presented as a variance argument, the treatment of pretrial holding conditions as a departure matter under the Guidelines and related case law is helpful to this analysis. While the Sentencing Guideline Manual stipulates that a sentencing court may grant a downward departure based on a factor which the Sentencing Commission did not consider when creating the Guidelines, *see* U.S.S.G. § 5K2.0 (quoting 18 U.S.C. § 3553(b)), pretrial conditions of confinement generally do not warrant a downward departure within the Guidelines framework. The Supreme Court has stated that a downward departure should not be permitted unless the facts of a particular case are "unusual enough for it to fall outside the heartland of cases in the

---

[1] As part of the his analysis, the defense asks the Court to factor into the sentencing determination the anticipated time the defendant will serve in ICE custody.  Def. Memo at 2, 5. Any time the defendant will serve in custody pending deportation is not for punishment purposes and is not an appropriate factor in calculating his term of imprisonment.

Guideline." *Koon v. United States*, 518 U.S. 81, 98 (1996).  Based on the *Koon* standard, a

defendant must be subjected to treatment worse than that of other inmates at the pretrial prison to

receive a downward departure.  *United States v. Valdes*, No. 01-068-JJF, 2004 WL 234648, at *2

(D. Del. Feb. 2, 2004) ("Conditions of confinement which impact all defendants facing

incarceration are insufficient to warrant a downward departure.") (citing *United States v.*

*Washington*, 95-124-3, 1997 WL 327459, at *2-3 (E.D. Pa. June 12, 1997)); *United States v.*

*Pachaco*, 67 F. Supp. 2d 495, 498 (E.D. Pa. 1999) (noting that "a defendant must demonstrate to

the court [that] the conditions [of pretrial confinement] compare unfavorably to those suffered by

other inmates" to receive a downward departure) (citing *United States v. Sutton*, 973 F. Supp.

488, 492-94 (D.N.J. 1997), *aff'd* 156 F.3d 1226 (3d Cir. 1998)); *United States v. Ogembe*, 41 F.

Supp. 2d 567, 571 (E.D. Pa. 1999).  Indeed, a defendant's case does not fall "outside the

heartland" unless he is treated more severely than his fellow inmates. *Cf. Pachaco*, 67 F. Supp.

2d at 498.  Moreover, this standard applies even if the conditions of the pretrial prison do not

meet the standards required at most federal facilities.

    In addition to suffering a special harm, a defendant must offer specific evidence of this

harm to receive a downward departure.  Indeed, a lack of evidence regarding pretrial holding

conditions is sufficient justification to deny a downward departure.  *United States v. Dyck*, 334

F.3d 736, 742-43 (8th Cir. 2003) (refusing to grant a downward departure due to lack of evidence

regarding conditions at the county jail); *Sutton*, 973 F. Supp. at 495 (refusing to grant a

downward departure "[i]n light of the inadequacy of the record" regarding the general conditions

of and the defendant's treatment at the pretrial confinement facility).  Consequently, extensive

documentation of the defendant's specific harm and the general prison conditions are necessary –

albeit not sufficient – to merit a downward departure or, as argued in this case, a variance.
*United States v. Mateo*, 299 F. Supp. 2d 201, 211-12 (S.D.N.Y. 2004) (granting a downward

departure to a defendant who was sexually assaulted during pre-sentence confinement and

received poor medical attention when giving birth); *United States v. Rodriguez*, 213 F. Supp. 2d

1298, 1303 (M.D. Ala. 2002) (granting a downward departure to a defendant who was raped

during pre-sentence confinement); *United States v. Francis*, 129 F. Supp. 2d 612, 616-20

(S.D.N.Y. 2001) (providing substantial documentation of both the conditions at the Hudson

County Correctional Center and of Francis' ailments that resulted from these conditions).

      In recognizing the offender's pre- or post-sentence conditions of confinement as

permissible grounds to warrant downward departures, the courts have granted relief generally

where the conditions in question are extreme to an exceptional degree and their severity *falls*

*upon the defendant in some highly unique or disproportionate manner*. *See, e.g., Rodriguez,* 213

F. Supp. 2d at 1303 (noting that "to fail to take this rape into account in [defendant's] sentence

would mete out a disproportionate punishment to her . . . ."); *Francis,* 129 F. Supp. 2d at 619

(finding that defendant had suffered "extraordinary stress and fear" under conditions at a state

prison qualitatively different from those experienced by detainees of federal detention facilities).

      Based on these standards, the defendant should not receive a downward departure.  While

the defendant alleges that the conditions at the Paraguayan jails are deplorable and cites to a State

Department report describing those conditions, poor prison conditions alone are not sufficient to

necessitate a variance absent the showing of a specific harm.  There simply is no reliable

evidence before this Court documenting any of the conditions of which the defendant complains

– the defendant does not even identify the prison in which he was held or describe its specific

conditions. *Pachaco*, 67 F. Supp. 2d at 498.  He offers only general reporting of the conditions at unspecified "Paraguay jails." Def. Memo at 10.   The defendant also offers no reliable evidence or documentation of the conditions *he* specifically endured while in Paraguayan custody pending extradition, much less that *he* suffered disparate and worse treatment in relation to other inmates at the Paraguayan prison.

Moreover, because the Paraguay facility the defendant was housed in is a foreign prison, the United States Government has no control over the operation of and conditions at that facility. Consequently, the government could not ensure or affect the conditions under which the defendant was held in that detention center.  And although the defendant spent approximately 2.5 years in pre-extradition custody in Paraguay following his arrest on the PAW, his prolonged confinement in any prison in Paraguay was largely a result of appeals the defendant and his Paraguayan counsel repeatedly undertook to prevent his extradition to the United States.  As the Court may recall, the government was anxious to have the defendant transported to the United States to face his charges and the government promptly coordinated the defendant's transport to the United States once the extradition process was completed.  Until such time as the defendant finished the appeals he initiated, the defendant was incarcerated in his own country, by his own government (albeit at the request of the United States pursuant to its Provisional Arrest Warrant request), under the same conditions of incarceration as every other prisoner.  He cannot now claim that Paraguay's alleged substandard penal practices give him some benefit under our law. The defendant's request for a variance from the stipulated Guidelines range on the basis of his pretrial holding conditions in Paraguay should be denied.

The defendant's pretrial incarceration at D.C. jail is also not a basis for a variance here.

The only criticism the defendant can muster for the D.C. jail conditions is that "conditions of confinement and opportunities for training and other services at the D.C. jail, a local facility, are less favorable than those available at federal facilities." Def. Memo at 10. It is simply not true that extradited defendants are placed in solitary segregation for months upon arrival to the United States. *See* Def. Memo at 10. As defendant's prior counsel reported on the record early on in the case, the defendant was temporarily placed on restrictions shortly after arrival as a result of *his own* failure to adequately adjust to U.S. custody, which counsel suggested was more "controlled" and "restrictive" than what the defendant had experienced in his Paraguayan facility. Moreover, despite an expectation that the defendant would plead guilty with his brother upon arriving in the United States in February 2011, the defendant chose to prolong plea negotiations for over a year, delaying any chance he would be able to leave D.C. Jail and be committed to a BOP facility soon after arrival. Moreover, the D.C. Jail's records reflect the defendant made or attempted to make well over 2,500 telephone calls between the beginning of March 2011, only days after his arrival, until the end of January 2012. Thus, any suggestion that the conditions at the D.C. Jail prevented him from being able to call his family is simply not true (nor does it suggest he would not be in a position to remain in contact with his family while in BOP custody). Notably, in *Shah*, the Court stated that, "the D.C. Circuit has squarely held that an extended stay at the D.C. Jail does not prejudice a defendant: '[L]ittle weight need be given to [the defendant's] complaint about his extended stay at the D.C. Jail while he awaited sentencing in the absence of any evidence that he was a victim of untoward or unusual suffering as a result. To the contrary, it is well established that a prisoner does not have a right to be housed in a particular institution.'" *United States v. Shah*, 263 F. Supp. 2d 10, 35-36 (D.D.C. 2003), *aff'd and remanded*, 453 F.3d 520 (D.C. Cir.

21

2006) (citing *United States v. Yelverton,* 197 F.3d 531, 538 n. 9 (D.C.Cir.1999)).

In sum, the defendant has not established that either his foreign or domestic pretrial

holding conditions support a variance from the Guidelines.

**The Defendant's Claimed "Breaking of the Plea Log Jam"**

The government also rejects that the defendant's guilty plea has "broken the log jam," *see*

Def. Memo at 11, such that he should receive a variance from the Guidelines range.  First, the

defendant was not the first of the four related case defendants to plead guilty; Yahya Ali Zaitar's

co-defendant, Mohammed Ali Awali, pled guilty to his cocaine importation / distribution

conspiracy case on March 9, 2012, *see* Criminal Case 1:07cr329-02 (RMC), nearly two months

before the defendant.  Related case defendant Amer Zoher El Hossni has not yet pleaded guilty

and remains set for trial at this time before Judge Rothstein (*see* Criminal Case 1:08cr172-02

(BJR)).  Moreover, neither the defendant, nor his brother, pleaded guilty until after considerable

government and judicial resources were incurred, and the defendant's brother remained

committed to proceed to trial up until the day he signed his plea – on the first day trial was

scheduled.  Thus, the defendant's plea did not lead others to plead guilty, as the defense submits,

and the government strongly opposes any variance from a Guidelines sentence on that basis.

Because the defendant's history and characteristics show a history of and clear propensity

towards committing drug crimes, and the defendant has offered no persuasive basis for any

downward variance from the Guidelines, a sentence of 70 months is appropriate.  Such a

sentence provides just punishment given the seriousness of the drug offense the defendant

engaged in, and promotes his, and other foreign defendants', respect for the law.  A term of 70

months imprisonment will also deter future criminal conduct by the defendant and protect the

public from the defendant's illegal drug trafficking activities in the future.

      **C.**     **Avoiding Disparity Among Similarly-Situated Defendants**

Section 3553(a)(6) articulates "the need to avoid unwarranted sentence disparities among defendants *with similar records* who have been found guilty of *similar conduct*."  18 U.S.C. § 3553(a)(6) (italics added); *see also United States v. Fernandez*, 443 F.3d 19, 28 (2d Cir. 2006) ("[D]isparity between non-similarly situated co-defendants is not a valid basis for a claim of error under 18 U.S.C. § 3553(a)(6)."); *United States v. Parker*, 462 F.3d 273, 278 (3d Cir. 2006) ("[Section] 3553(a)(6) by its terms plainly applies only where co-defendants are similarly situated.").  By its terms, the statute requires a specific evaluation of the defendants' records and conduct.  When determining whether a sentence creates an unwarranted disparity, the Court should also consider a defendant's acceptance of responsibility, the nature and extent of a defendant's participation in the criminal activity, a defendant's criminal history, and whether and to what extent a defendant cooperated.  Other Circuits support using such factors in a § 3553(a)(6) analysis.  *See, e.g.*, *United States v. Davis-Bey*, No. 09-2851, 2010 WL 1929764 (8th Cir. May 14, 2010) ("[I]t is not an abuse of discretion for a district court to impose a sentence that results in a disparity between co-defendants when there are 'legitimate distinctions' between the co-defendants."); *United States v. Carter*, 560 F.3d 1107, 1121 (9th Cir. 2009) ("[A] sentencing disparity based on cooperation is not unreasonable."); *United States v. Zapata*, 546 F.3d 1179, 1194 (10th Cir. 2008) ("[D]isparate sentences are allowed where the disparity is explicable by the facts on the record."); *United States v. Boscarino*, 437 F.3d 634, 638 (7th Cir. 2006) ("[A] sentencing *difference* is not a forbidden 'disparity' if it is justified by legitimate considerations, such as rewards for cooperation.").

23

Thus, when analyzing claims of unwarranted sentence disparities, the Court should not rely on general claims of differences in sentences between broad groups of defendants, as the defendant proposes in his memorandum.  As the Court of Appeals for the Seventh Circuit recognized, it is not enough for a defendant to argue that "a few cases from any particular circuit seem to cast doubt on his sentence." *United States v. Newsom*, 428 F.3d 685, 689 (7th Cir. 2005).  The sentencing court needs to know "more than the crime of conviction and the total length of the sentence to evaluate disparities; the specific facts of the crimes and the defendant's individual characteristics are also pertinent." *Id.*  Similarly, the Court of Appeals for the Fifth Circuit found that "averages of sentences that provide no details underlying the sentences are unreliable to determine unwarranted disparity." *United States v. Willingham*, 497 F.3d 541, 544 (5th Cir. 2007) (finding that such figures "do not reflect the enhancements or adjustments for the aggravating or mitigating factors that distinguish individual cases").  For example, a defendant's "vague reference to other white-collar criminals does not demonstrate that they were actually 'similarly situated' to him or that any alleged sentencing disparity was 'unwarranted.'" *United States v. Leitner*, 344 F. App'x 950 (5th Cir. 2009) (unpublished table decision).

Here, the defendant makes only general and conclusory references to sentences received by other defendants without any meaningful evaluation of what factors may have accounted for the sentences received, including prosecutorial discretion to hold the defendant's accountable for a lower base offense level and to resolve the case via a plea based on the evaluation of the strength and/or weaknesses of the evidence, availability of foreign witnesses, or conservation of government and judicial resources.  Nor does it account for differences in Criminal History Category determinations, role evaluations, or departures, nor any variances which may have been

imposed by any given judge for reasons that may have been defendant-specific.

Moreover, § 3553(a) does not ban all disparities in sentencing, only *unwarranted* ones. *See* 18 U.S.C. § 3553(a)(6) (expressing "the need to avoid *unwarranted* sentence disparities among defendants with similar records who have been found guilty of similar conduct") (emphasis added); *see also United States v. Newsom*, 428 F.3d 685, 689 (7th Cir. 2005) ("[Section] 3553(a) does not ban all disparities; its concern is only with *unwarranted* disparities."). The cases in this Circuit highlight the factors the court should consider when evaluating whether a sentencing disparity is unwarranted.  In *Mejia*, the Court of Appeals for the District of Columbia addressed the issue of unwarranted sentence disparities under § 3553(a)(6) and concluded that the difference in sentences was entirely explained by the co-defendant's acceptance of responsibility and thus any disparity resulting from the defendant's "harsher" sentence was not unwarranted.  *United States v. Mejia*, 597 F.3d 1329, 1344 (D.C. Cir. 2010).  In *Colwell*, the major factor the Court of Appeals considered when upholding a sentence against a § 3553(a)(6) challenge was the co-conspirators' criminal history category, but it also considered the number of fraudulent transactions in which the co-conspirators participated, how much the co-conspirators contributed to the conspiracy's success, and the crime to which each of the co-conspirators pled guilty.  *United States v. Colwell*, 304 F. App'x 885, 885-86 (D.C. Cir. 2008). In *Bras*, the Court of Appeals concluded that a defendant's prison sentence was not unwarranted because the defendant and his co-conspirators "did not hold comparable positions, either in the conspiracy or in their workplaces."  *United States v. Bras*, 483 F.3d 103, 114 (D.C. Cir. 2007). The court also noted, significantly, that the co-conspirators "provided substantial assistance in the investigation of the scheme, while [the defendant] did not."  *Id.*  The defendant has not

25

sufficiently demonstrated that a sentence of 70 months would create an unwarranted sentencing

disparity among defendants with similar records who have been found guilty of similar conduct.

In addition, it is important to remember that § 3553(a)(6) is only one factor the Court

should consider when sentencing the defendant.  *United States v. Colwell*, 304 F. App'x 885, 886

(D.C. Cir. 2008); *see also United States v. Fernandez*, 443 F.3d 19, 32 (2d Cir. 2006) ("[T]he

requirement that a sentencing judge consider an 18 U.S.C. § 3553(a) factor is *not* synonymous

with a requirement that the factor be given determinative or dispositive weight in the particular

case, inasmuch as it is only one of several factors."); *United States v. Charles*, 467 F.3d 828, 833

(3d Cir. 2006) ("[Section] 3553(a)(6), is just one factor (if relevant) that should be balanced

against the others (again, if relevant)."); *United States v. Morales-Chaires*, 430 F.3d 1124, 1131

(10th Cir. 2005) ("Section 3553(a)(6)'s directive . . . is but one of several factors for a court to

consider in determining a reasonable sentence.").  This Court should consider all of the § 3553(a)

factors to determine whether they support the defendant's sentence.  *Gall v. United States*, 552

U.S. 38, 49-50 (2007); *see also Kimbrough v. United States*, 552 U.S. 85, 108 (2007) ("Section

3553(a)(6) directs district courts to consider the need to avoid unwarranted disparities – along

with other § 3553(a) factors – when imposing sentences.").

Also, there is a rebuttable presumption of reasonableness which attaches to a properly

calculated Guidelines sentence.  *See United States v. Dorcely*, 454 F.3d 366, 376 (D.C. Cir.

2006); *see also United States v. Boscarino*, 437 F.3d 634, 638 (7th Cir. 2006) ("Sentencing

disparities are at their ebb when the Guidelines are followed, for the ranges are themselves

designed to treat similar offenders similarly."); *United States v. Simmons*, 218 F.3d 692, 696 (7th

Cir. 2000) ("[A] disparity among co-defendants' sentences is not a valid basis to challenge a

guideline sentence otherwise correctly calculated.").  As the Court of Appeals for the District of

Columbia held in recent years, analysis under § 3553(a)(6) "does not rebut the presumption

established by [a] within-Guidelines sentence."  *United States v. Russell*, 600 F.3d 631, 636

(D.C. Cir. 2010) (discussing the broad range of supervised release proscribed in U.S.S.G. §

5D1.2(b)(2)).  Furthermore, a defendant is only entitled to "a weighing of the section 3553(a)

factors that are relevant to [his] case, not to a particular result."  *United States v. Carrasco-De-

Jesus*, 589 F.3d 22, 29 (1st Cir. 2009).

Considering the nature of the defendant's criminal conduct while he participated in the

conspiracy, the properly calculated Sentencing Guidelines range of 70-87 months is fair and

appropriate and will not result in an unwarranted sentence disparity as contemplated by §

3553(a)(6).  It is also worth noting the sentences facing the related case defendants who were all

engaged in similar conduct in the Tri-Border region (all defendants were Criminal History

Category I).  To relate these defendants and their conduct in a unique region of South America to

Colombian defendants is not necessarily an appropriate comparison.  Related case defendant

Mohammed Ali Awali faces a Guidelines range of 87-108 months pursuant to his Plea

Agreement wherein he was held accountable for distributing or conspiring to distribute at least

15 kilograms but less than 50 kilograms of cocaine.  In that case, Awali and the defendant's

brother, Yahya Ali Zaitar, actually supplied 1 kilogram of cocaine to a Paraguayan undercover

agent.  Like the defendant here, Awali satisfied the "Safety Valve" provisions and received a

three-level reduction for acceptance of responsibility.  The government agreed in Awali's plea to

make a recommendation to the Court at sentencing that the defendant receive a sentence at the

lowest end of the Guidelines range, *i.e.*, 87 months.  Awali's sentencing hearing is pending.

Similarly, the defendant's brother, Yahya Ali Zaitar, faces a Guidelines range of 87 to 108 months of incarceration pursuant to his plea which resolves both a cocaine and heroin case. Considering the sentences faced by these related defendants, coupled with the considerable active role the defendant played in coordinating the transport of the test sample of heroin, a sentence of 70 months is reasonable.

Taking into consideration all of the above and the § 3553(a) goals, the government submits that a sentence within the Guidelines range of 70-87 months on Count One, and specifically a sentence of 70 months imprisonment, yields a sentence that is sufficient but not greater than necessary to achieve the purposes of § 3553(a).

**CONCLUSION**

Therefore, for the above-stated reasons, the United States submits that a sentence of 70 months, which falls within the parties' stipulated Guidelines range of 70-87 months, would be reasonable and would account for each of the factors set forth in 18 U.S.C. § 3553(a). Therefore, the United States respectfully asks this Court to impose upon the defendant a sentence of 70 months imprisonment. The government also seeks imposition of a period of supervised release of at least four years.

Respectfully submitted this 13th day of June 2012.

ARTHUR G. WYATT, Chief
Narcotic and Dangerous Drug Section
Criminal Division
U.S. Department of Justice

By:    /s/  Meredith A. Mills
       Meredith A. Mills (D.C. Bar # 457843)
       Trial Attorney

Narcotic and Dangerous Drug Section
Criminal Division / U.S. Department of Justice
1400 New York Avenue, NW
Washington, DC 20005
Main Office: (202) 514-0917
Fax: (202) 514-0483
Meredith.Mills@usdoj.gov

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 13th day of June 2012, I filed the foregoing POSITION OF
THE UNITED STATES WITH RESPECT TO SENTENCING FACTORS with the Clerk of the
Court via ECF / CM.  A copy will be served on the following via the Notice of Electronic Filing
(NEF) system:

<u>Counsel for Defendant NEMR ALI ZHAYTER</u>
Carmen D. Hernandez, Esq.
7166 Mink Hollow Road
Highland, MD 20777
Tel: 202-628-0090 / Fax: 202-628-2881
chernan7@aol.com


/s/  Meredith A. Mills
Meredith A. Mills (D.C. Bar # 457843)
Trial Attorney
Narcotic and Dangerous Drug Section
Criminal Division / U.S. Department of Justice
1400 New York Avenue, NW
Washington, DC 20005
Main Office: (202) 514-0917
Fax: (202) 514-0483
Meredith.Mills@usdoj.gov